IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>　　　　Plaintiff, | : | Civil No. 1:18CV00025 |
| v. | : | |
| $229,985.00 in U.S. CURRENCY,<br>　　　　Defendant. | : | |

## VERIFIED COMPLAINT OF FORFEITURE

NOW COMES Plaintiff, the United States of America, by and through Matthew G.T. Martin, United States Attorney for the Middle District of North Carolina, and respectfully states as follows:

1.　　This is a civil action *in rem* brought to enforce the provisions of 21 U.S.C. § 881(a)(6) for the forfeiture of the defendant property, which was furnished or intended to be furnished in exchange for a controlled substance, in violation of Title II of the Controlled Substances Act, 21 U.S.C. §§ 801 *et seq*., or represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate violation of the Controlled Substances Act.

2.　　This action is also brought to enforce the provisions of 18 U.S.C. § 981(a)(1)(C) for the forfeiture of the aforesaid defendant property which constitutes or was derived from proceeds traceable to an offense constituting specified unlawful activity as defined in 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such offense, specifically the exchange of a controlled substance in violation of state or federal law.

3. The defendant property is $229,985.00 in U.S. Currency, which was seized on August 1, 2017, in Greensboro, North Carolina, while located within the jurisdiction of this Court, and has been deposited to the United States Marshals Service Seized Asset Deposit Fund.

4. Plaintiff brings this action *in rem* in its own right to forfeit and condemn the defendant property. This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345, and over an action for forfeiture under 28 U.S.C. § 1355(a).

5. Venue is proper in this district pursuant to 28 U.S.C. §§ 1355(b)(1) and 1395, because the defendant property was seized while located in the jurisdiction of this Court, or one or more of the acts giving rise to forfeiture occurred in this district.

6. Upon the filing of this complaint, Plaintiff requests that the Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b), which Plaintiff will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

7. The facts and circumstances supporting the seizure and forfeiture of the defendant property are contained in Exhibit A, attached hereto and wholly incorporated herein by reference.

WHEREFORE, the United States of America prays that process of a Warrant for Arrest and Notice *In Rem* be issued for the arrest of the defendant property; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the defendant property be forfeited to the United States of America for disposition according to law; and that the United States of America be

granted such other relief as this Court may deem just and proper, together with the costs and disbursements of this action.

This the 11th day of January, 2018.

Respectfully submitted,

MATTHEW G.T. MARTIN
United States Attorney


/s/ Steven N. Baker
Steven N. Baker
Assistant United States Attorney
NCSB #36607
101 S. Edgeworth Street, 4th Floor
Greensboro, NC   27401
Phone: (336)333-5351
Email: steve.baker3@usdoj.gov

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury under the laws of the United States of America, that the contents of the foregoing Complaint are true and correct to the best of my knowledge, information and belief.

David Peterson
Task Force Officer
Drug Enforcement Administration

DECLARATION

I, David Peterson, a Task Force Officer with the Drug Enforcement Administration (DEA), Greensboro, North Carolina, hereby state, pursuant to 28 U.S.C. § 1746, under penalty of perjury and pursuant to the laws of the United States, that the following is true and correct to the best of my knowledge, information, and belief:

1. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 21, United States Code.

2. I have been a DEA Task Force Officer since January 2014, and I have been employed with the North Carolina State Highway Patrol (NCSHP) as a State Trooper since January 2003. During this time, I was assigned to New Hanover County as a District Trooper. My responsibilities included: conducting traffic stops for various traffic violations, Driving While Impaired (DWI) arrests, traffic collision investigations, criminal arrests, and other NCSHP Assignments. In May 2008, I was selected to NCSHP's Criminal Interdiction Unit (CIU) and have been assigned to that unit since that time. CIU is assigned to the major interstates of North Carolina, and it assists federal, state, and local agencies with cases involving criminal activity on those interstates. As part of CIU, I have arrested numerous individuals trafficking in cocaine, marijuana, heroin, and methamphetamine. I have also been involved with several investigations into violations of other criminal activities such as credit card fraud, weapons trafficking, and money laundering. In 2009, I was selected as a Narcotics Detection Dog Handler and

GOVERNMENT EXHIBIT A

held that position for four years. I have attended numerous law enforcement classes related to criminal interdiction, such as CIU's yearly in-service, federal HIDTA/DIAP conferences and training seminars, roadside criminal interdiction schools, and roadside interview technique classes. I have participated in investigations involving physical surveillance, the use of wire and electronic communication interceptions, and federal search warrants. I am up to date with the methods used by drug traffickers to conceal their illegal proceeds.

3. This declaration is submitted in support of a Verified Complaint of Forfeiture for $229,985.00 in U.S. currency seized on August 1, 2017, from Armando CASTELLANOS.

4. Based on the investigation described below, there is probable cause to believe the $229,985.00 in U.S. currency is subject to forfeiture pursuant to 21 U.S.C. § 881 and 18 U.S.C. § 981.

5. The facts and circumstances set forth in this Declaration are based upon information provided by other law enforcement officers and my own personal knowledge and experience.

6. On August 1, 2017, at approximately 4:00 p.m., NCSHP Trooper B.P. Daniels was on preventive patrol in Guilford County on McLeansville Road. Trooper Daniels observed a white, Chevrolet Blazer traveling in excess of the posted speed limit of 35 miles per hour. Trooper Daniels estimated the speed of the Blazer to be approximately 50 miles per hour as it traveled north on McLeansville Road. Using his radar, Trooper Daniels was able to clock the speed of the Blazer at 48 miles per hour in

2

the posted 35-mph speed zone. Trooper Daniels activated his emergency equipment to include siren, then passed another vehicle traveling in the same lane behind the Blazer, to overtake the Blazer, for the purpose of conducting a traffic stop.

7. Trooper Daniels followed the white Chevrolet Blazer for a short distance from the rear with his emergency equipment activated. The Blazer reduced speed and turned into a nearby shopping center parking lot before coming to a complete stop. Trooper Daniels exited his patrol vehicle and approached the Blazer on the driver's side while observing two occupants: one driver and one front-seat passenger.

8. Upon making contact with the operator and passenger of the vehicle, Trooper Daniels identified himself and stated his reason for the traffic stop: speeding. Trooper Daniels requested the operator's driver's license, which was provided. The driver was identified as Armando CASTELLANOS from his Ohio driver's license. CASTELLANOS also provided a 2015 North Carolina registration card that had been previously assigned to a prior owner of the Blazer. An Ohio registration card for the vehicle was not provided. Trooper Daniels asked the front seat passenger for identification. CASTELLANOS spoke for the passenger, stating the passenger was his cousin and he (CASTELLANOS) knew that his cousin did not have any proof of identification. CASTELLANOS further stated that he told his passenger not to bring any identification. Trooper Daniels asked CASTELLANOS why he would do that and CASTELLANOS stated that they were "just going to the house."

9. Trooper Daniels advised CASTELLANOS that he was going to issue a warning for the speeding violation and requested that CASTELLANOS come to the

3

patrol vehicle. CASTELLANOS willfully exited the vehicle, walked to the front passenger side of the patrol vehicle, and allowed Trooper Daniels to conduct a consensual frisk of his person with negative results. CASTELLANOS then had a seat in the front passenger seat of the patrol vehicle. Trooper Daniels began speaking with CASTELLANOS in casual conversation while conducting records checks and enforcement action. Trooper Daniels asked CASTELLANOS where he was going and CASTELLANOS stated he was driving to his cousin's house, then to Ohio. CASTELLANOS stated he worked at a Mexican restaurant in Massillon, Ohio, and also as a landscaper, operating a "weed whacker." CASTELLANOS further stated that he came to North Carolina two weeks prior, but was staying in Danville, Virginia, with his cousin.

10. CASTELLANOS inquired about his speed and Trooper Daniels advised that he was traveling at 48 miles per hour. CASTELLANOS replied that his dashboard indicated 45 in the 45-mph zone and 35 in the 35-mph zone. CASTELLANOS also stated that he had just changed the tires on the vehicle. CASTELLANOS stated that his purpose for coming to North Carolina was to meet his cousin's cousin, who is a female teacher from Mexico. He wanted to take her out on a date, but that did not happen. Trooper Daniels asked CASTELLANOS how far of a drive it was to Ohio and he initially stated it was a 7-hour drive, then stated it was an 8-hour drive from their current location. CASTELLANOS added that he stops at the Travel Plazas to sleep when he travels.

11. At that time, NCSHP Sergeant J.S. Wooten pulled into the parking lot and exited his patrol vehicle to assist Trooper Daniels. Sgt. Wooten observed a male subject

4

sitting in the passenger front seat in Trooper Daniels' vehicle and a male passenger sitting in the passenger front seat of the Chevrolet Blazer. Sgt. Wooten approached the Blazer and spoke to the male, who identified himself as Juan Alevedo Sanchez Lopez. Lopez did not speak English with Sgt. Wooten, so their communication was strained.

12. Trooper Daniels asked CASTELLANOS where his passenger stays or lives and CASTELLANOS stated that he lives in Danville, Virginia. CASTELLANOS then stated that he brought his passenger (cousin) from California. Trooper Daniels asked CASTELLANOS where his cousin worked, and he stated that they were starting a landscaping business together. Sgt. Wooten then approached Trooper Daniels' driver's side door and asked what CASTELLANOS had said the passenger's name was. Trooper Daniels then looked at CASTELLANOS to provide the information and CASTELLANOS paused before stating, "his name, ahh, should be, ahh, Roberto." Trooper Daniels asked CASTELLANOS what his cousin's last name was, and he replied, "I'm not sure." Trooper Daniels followed up, stating, "But he's your cousin," and "he's your cousin that you brought from California," to which CASTELLANOS replied "I'm not going to lie to you, I'm not sure." Trooper Daniels then confronted CASTELLANOS, asking, "He's not really your cousin, is he?" to which CASTELLANOS replied, "No, sir."

13. Trooper Daniels returned CASTELLANOS' driver's license to him, as well as the warning ticket, registration, and three cell phones. Trooper Daniels asked CASTELLANOS if he had any questions and he replied, "no, sir." Trooper Daniels then asked CASTELLANOS if he (Trooper Daniels) could ask some questions.

5

CASTELLANOS replied, "yes, sir." Trooper Daniels asked CASTELLANOS if he had ever been arrested before. CASTELLANOS stated that he had been arrested and served time for kidnapping. Trooper Daniels asked CASTELLANOS if he had anything illegal in the vehicle; any cocaine, marijuana, heroin, or ecstasy in the vehicle, and CASTELLANOS stated he did not. Trooper Daniels asked CASTELLANOS if he had any U.S. currency in the vehicle. CASTELLANOS briefly began to nod his head up and down in the affirmative before slightly shaking his head side to side and replying, "no, sir." Trooper Daniels then asked CASTELLANOS if he could search the vehicle and its contents. CASTELLANOS hesitated, then replied, "I don't think that would be fair." Trooper Daniels advised CASTELLANOS that he was just asking if he could search the vehicle, and that CASTELLANOS could say yes or no. Trooper Daniels then asked once more if he could search the vehicle, to which CASTELLANOS replied, "no, sir."

14. At that point, Trooper Daniels advised Sgt. Wooten that CASTELLANOS had refused a search of the vehicle. Trooper Daniels asked the front seat passenger to step out of the vehicle, which he willfully agreed to do. Once outside of the vehicle, the passenger consented to a protective frisk of his person with negative results. Sgt. Wooten then stayed with CASTELLANOS and the passenger while Trooper Daniels prepared to deploy his narcotics detection canine, Bik, for an exterior canine sniff of the Blazer.

15. Trooper Daniels conducted a safety scan around the Blazer, then retrieved canine Bik from his patrol vehicle. Trooper Daniels deployed Bik by giving him the command to "find it" and, and Bik sniffed at a moderate pace. Bik displayed a noticeable and articulable change of behavior as he passed by the left rear wheel and tire. Bik

6

continued to sniff the driver's side rear, then around the rear of the vehicle to the right rear wheel and tire. Bik's body locked out in final response and both of his ears perked up as he stared at the right rear wheel and tire. Trooper Daniels observed this change in behavior to be an alert to the presence of the odor of narcotics. Bik was placed back inside the patrol vehicle following canine deployment.

16. Trooper Daniels has successfully demonstrated the ability to properly deploy and maintain a police/narcotics detection canine and has effectively used this training to locate "concealed" controlled substances (marijuana, hashish, heroin, methamphetamine, ecstasy, powder and crack cocaine) with the assistance of his canine. In addition, Trooper Daniels has attended numerous seminars/training sessions, which exposed him to basic and advanced police canine tactics, training and animal behavior.

17. Canine Bik is a four-year-old German Shepard, a breed specifically selected for their keen senses and ability to be trained to detect the odor of controlled substances. Canine Bik completed 13 weeks and approximately 455 hours of training through the Virginia State Police Canine Training Program. Canine Bik is trained to detect the presence of the odor of narcotics, including marijuana, hashish, heroin, methamphetamine, ecstasy, powder and crack cocaine. Canine Bik has proven reliable in using his olfactory senses to locate narcotic training aids of actual controlled substances that are listed above. Canine Bik has reliably detected large amounts of narcotics and United States currency concealed inside automobiles and elsewhere since being placed into service.

7

18. Trooper Daniels and canine Bik were certified by the Virginia State Police Training Center on November 30, 2016. They were most recently certified by the NCSHP on April 18, 2017.

19. Following canine Bik's alert to the rear of the vehicle, Trooper Daniels conducted a hand search of the vehicle and located a blue suitcase in the rear cargo area. He opened the suitcase and observed a white pillow inside, which concealed its contents. Trooper Daniels removed the pillow and observed a purple fitted bed sheet concealing a large amount of U.S. currency. The currency was vacuum-sealed in several stacks inside the suitcase. Trooper Daniels advised CASTELLANOS that he was being detained. CASTELLANOS was placed in handcuffs and leg shackles, both of which were double-locked. Trooper Daniels then took digital photographs of the vehicle, as well as the currency and both occupants of the Chevrolet Blazer. Sgt. Wooten and Trooper Daniels then transferred the currency from the suitcase to state-issued clear, plastic evidence bags, and then placed the evidence bags in the rear of Sgt. Wooten's patrol vehicle.

20. CASTELLANOS was transported by Trooper Daniels to the NCSHP Troop D District Two Office in Greensboro for further investigation. Sgt. Wooten transported the passenger, Mr. Sanchez-Lopez, and all seized evidence to the same location.

21. Trooper Daniels interviewed CASTELLANOS at the office and gave him a Disclaimer of Ownership of Assets and Waiver of Rights to Notice of Seizure form. Trooper Daniels read the form aloud to CASTELLANOS while he also read on his own. CASTELLANOS voluntarily signed the form and stated to me, "I'm not claiming the

8

Case 1:18-cv-00025 Document 1-1 Filed 01/11/18 Page 8 of 10

money." He refused to provide any information as to how or why there was so much vacuum-sealed U.S. currency in his vehicle.

22. Trooper Daniels provided CASTELLANOS with a NCSHP Adult Miranda Warnings form, which I read aloud to him. CASTELLANOS initialed that he understood the rights, and he refused to answer questions without an attorney present.

23. At approximately 5:30 p.m., I requested Trooper Daniels utilize canine Bik for the purpose of a second canine sniff of the seized currency. The second sniff was conducted in the parking lot of the NCSHP Troop D Radio Shop. I laid three packages out, in a line formation, with one package containing the seized currency. Trooper Daniels gave Bik the command to "find it." On the initial pass, canine Bik displayed a noticeable change as he passed by the second package. Bik traced the odor to its source and his body then locked out in final response, with both ears perked up. Trooper Daniels observed this to be a positive alert to the presence of the odor of narcotics.

24. Authorization for the federal adoption and seizure of the defendant currency was given following the second canine sniff and alert. I, along with DEA Special Agent A. Cortes, assumed custody and control of the currency.

25. On August 3, 2017, SA Cortes and I retrieved the currency from the DEA Evidence Custodian, following all necessary protocols, and transported it to LOOMIS to obtain an official count. The currency totaled $229,985.00 in U.S. Currency. SA Cortes and I were given a receipt from LOOMIS in the amount of $229,985.00, and the currency was then deposited into the United States Marshals Service Seized Asset Deposit Fund Account, where it remains.

26. DEA began administrative forfeiture proceedings. On October 13, 2017, CASTELLANOS filed a claim to the defendant currency, identifying his interest in the property as being the "owner." The administrative forfeiture process was terminated, and the seizure was referred to the United States Attorney's Office for judicial forfeiture.

## CONCLUSION

27. Based upon the foregoing, I am of the opinion that there is probable cause to believe that the $229,985.00 in U.S. Currency seized from CASTELLANOS was furnished or intended to be furnished in exchange for a controlled substance, or represents proceeds traceable to the exchange of a controlled substance, and is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(C).

This 11th day of January, 2018.

David Peterson
Task Force Officer
Drug Enforcement Administration